CRABTREE, J.T.C.
This is a local property tax case involving the valuation of yet another failed condominium. Cf. Bloomfield Assocs. v. Bloomfield, 12 N.J.Tax 501 (Tax 1992). The Bloomfield case involved a tax appeal by the condominium sponsor, while the present case *56 involves an appeal by an investor who made a bulk purchase of units from the sponsor.
More specifically, the cases before the court arise from Essex County Board of Taxation affirmances of the 1990 assessments on 20 condominium units in the condominium known as Prospect Towers, located at 275 Prospect Street, East Orange, New Jersey (Block 642, Lot 4). The units and their assessments are as follows:
Occupancy Assessment Size Unit #
1 bdrm Vacant $19,900 2H
2 bdrm " 23,000 8C
2 bdrm " 24,200 9F
2 bdrm " 24,200 12F
1 bdrm " 19,700 14D
2 bdrm " 34,900 16C
2 bdrm protected[1] 19,500 BL (basement)
2 bdrm " 21,800 3C
2 bdrm " 23,000 8F
2 bdrm " 24,200 9C
2 bdrm " 24,200 12C
1 bdrm " 19,700 14E
1 bdrm " 19,700 14G
1 bdrm " 19,700 15D
1 bdrm " 24,900 16G
1 bdrm senior[2] 22,300 6D
2 bdrm " 18,700 11F
2 bdrm " 20,300 15C
2 bdrm " 26,400 15F
1 bdrm " 19,700 17B
Prospect Towers is a 16-story apartment building containing 190 units. It was converted to condominium ownership in October *57 1987. The sponsor, Regency Holdings Co., sold 57 units in 1987, 36 units in 1988 and 10 units in 1989. While it appears that many of the units were sold to end users, the evidence is confusing and contradictory as to the status of the purchasers of the 103 units, i.e., how many were investors, how many were protected tenants and how many were outsiders purchasing for occupancy. By deed dated February 6, 1989 the sponsor sold 15 units to Philip Rosen, an investor, for $813,000. Of these units, eight were occupied by non-senior protected tenants and seven were occupied by protected seniors. Rosen also purchased three units in December 1987 for $39,900 each.
By deed dated March 2, 1989 the sponsor sold 11 units to Murray Simpson, another investor, for $589,798. Only one of these units was vacant at the time of the sale; the remaining units were occupied by protected non-senior tenants.
The sponsor sold 61 units to plaintiff on November 27,1989 for $2,745,000.[3] The deed was recorded on September 27, 1991. Twenty of these units are the subject of this proceeding.
At all times pertinent hereto rents were controlled by ordinance in the defendant municipality. A vacancy decontrol ordinance was also in effect on the assessing date. Under that ordinance an apartment unit is eligible for decontrol and exemption from rent control only if the “tenant vacates the apartment voluntarily and there is no unreasonable pressure from the landlord or his agent; and the tenant vacates the apartment as a result of a court order from a court of competent jurisdiction.” The ordinance also contains the following provision:
This ground shall not be available to a landlord who receives a court order to dispossess a tenant based upon a tenant holding over and continuing in possession of the premise after the expiration of his/her term. Issues concerning the *58 circumstances of the vacation of a unit by a tenant, shall be reviewable by the Rent Leveling Board. In the event the Board determines that a landlord is seeking to decontrol or has decontrolled a dwelling unit under circumstances other than those set forth herein this Ordinance, the Rent Leveling Board may:
a. Rescind the decontrol of the dwelling unit and the rent shall revert to that rental on the dwelling unit prior to vacation of the unit; and
b. Prosecute the landlord for violation of this Ordinance.
The decontrol ordinance is not self-executing. To decontrol the rent for any given apartment the landlord must file with the rent leveling board a certification indicating the name of the vacating tenant, the existing rental, the circumstances under which the tenant vacated the unit, the name of the new tenant, and the new rental and its effective date. The landlord must also submit a certificate of habitability required by another East Orange ordinance.
None of the occupied units among the 20 units before the court had been renovated. Of the six vacant units, three had been renovated. From the credible evidence I find the renovation costs to be $5,000 a unit.
Plaintiffs expert estimated the true values of the subject units [4] to be as follows:
VACANT UNITS
Unit # True Value
2H $38,449
8C 40.643
9F 44.008
12F 40.643
VACANT UNITS
Unit # True Value
14D $31,719
16C 44.008
UNITS OCCUPIED BY PROTECTED NON-SENIOR TENANTS
Unit # True Value
BL $36,714
3C 41,992
*59 Unit # True Value
8F $41,679
9C 41.992
12C 41.992
Unit # True Value
14E $30,289
14G 32,091
15D 32,825
16G 33,613
UNITS OCCUPIED BY PROTECTED SENIOR TENANTS
Unit # / True Value
6D $27,603
11F 35,896
15C 36.844
15F 36.844
17B 21,502
In arriving at these conclusions of value the expert utilized the income and sales comparison approaches to value. The aforestated value estimates are developed by means of the income approach, upon which the expert placed her primary reliance. Her sales comparison approach utilized sales of 22 condominium units in Falcon Towers, a multi-story high-rise apartment building across the street from Prospect Towers. Falcon Towers was converted to condominium ownership in October 1988. The 22 sales in question occurred between October 1988 and November 1990. The evidence indicates that all 22 sales were to end users. To arrive at value estimates for the 20 subject units the expert made a negative adjustment for refurbishing of $10,000 a unit, a positive adjustment of $5,000 a unit for the superiority of the subjects’ lobby and the services of a doorman and negative adjustments of 25% and 50% for protected non-senior tenants and senior tenants, respectively. These adjustments resulted in the following value estimates under the sales comparison approach:
*60 RENOVATED VACANT UNITS (3)
1 bdrm 2 bdrm
$63,900 $73,000
UNRENOVATED VACANT UNITS (3)
1 bdrm 2 bdrm
$53,900 $63,000
PROTECTED NON-SENIOR TENANTS (9)
1 bdrm 2 bdrm (incl. basement)
$40,425 $47,250
PROTECTED SENIOR TENANTS (5)
1 bdrm 2 bdrm
$26,950 $31,500
In developing her value estimates under the income approach she estimated market rents for the vacant units on the basis of the highest rents actually charged for the occupied units, which she then compared to classified advertisements for apartments in East Orange. She thus arrived at monthly rentals for the unrenovated vacant units of $750 for one-bedroom units and $950 for two-bedroom units. She estimated the monthly rentals for renovated units at $850 (one bedroom) and $1,000 (two bedroom). She then deducted a 7.5% vacancy allowance, expenses for maintenance and interior repairs and insurance, capitalizing the resulting net income at 16.1356%, which included an effective tax rate of 4.6356%.
For the units occupied by non-senior protected tenants whose occupancy protection would expire approximately one year after the valuation date, the expert considered the contract rents to be the market rents. After allowing for the same expenses posited for the vacant units (except for vacancy allowance) she calculated the present value of the net income stream for one year for each unit, assuming an 11.5% discount (her estimated cost of capital) and added the present value of the reversion, which she computed *61 by applying a present value factor of 0.89686 to the estimated values of the vacant units.
For the five units occupied by protected seniors the expert considered the contract rents to be the market rents. After allowing for the same expenses utilized in valuing the units occupied by protected non-senior tenants (and assuming no vacancies) she capitalized the net income at 16.386%, including an effective tax rate of 4.636%.
Defendant’s expert estimated the true values of the subject units to be as follows:
Unit # Tenant Status True Value
BL Protected $ 60,500
2H Vacant 63,700
3C Protected 80,700
6D Senior 54,700
8C Vacant 94,900
8F Protected $ 84,900
9C Protected 89,300
9F Vacant 105,000
11F Senior 78,800
12C Protected 89,300
12F Vacant 100,000
14D Vacant 81,400
14E Protected 73,000
14G Protected 73,000
15C Senior 85,400
15D Protected 73,000
15F Senior 85,400
16C Vacant 113,900
16G Protected 73,000
17B Senior 64,400
In arriving at these conclusions of value the expert relied solely on the sales comparison approach. In this regard he used 20 sales of other units in Prospect Towers and adjusted for refurbishing, bulk sale and occupancy status, viz, 20% discount for protected non-senior tenants and 30% for protected seniors. These sales, all *62 to users, closed between June 19, 1988 and October 31, 1989. Only two of the sales closed after March 16, 1989.
The first issue to be resolved is the highest and best use of the subject units. Highest and best use has been defined as:
The reasonably probable and legal use of ... an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. [American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9th ed.1987) at 269; see also Chevron U.S.A., Inc. v. Perth Amboy, 10 N.J.Tax 114, 145 (Tax 1988), aff'd o.b., 237 N.J.Super. 280, 567 A.2d 597 (App.Div.1989), certif. denied, 121 N.J. 628, 583 A.2d 324 (1990)].
Plaintiff’s expert concludes that the highest and best use of the subject units is for investment, not end use. In support of her conclusion her appraisal purports to show the change from sales to owner-occupants (end users) to sales to investors, presumably for income. Thus, the chart reproduced in her appraisal and a related exhibit indicate 100 sales to end users in 1987,1988 and early 1989 and 90 sales to investors in 1989. Her testimony, however, contradicts her own charts. She declared at one point during direct examination that of the first 100 sales, 28 were to investors.
Also, sales of condominium units in Falcon Towers, an apartment building across the street from Prospect Towers, indicate a market for end users on the assessing date. Detailed information contained in plaintiff’s appraisal shows 22 sales of Falcon Towers units to end users during October 1988 to November 1990, a period that brackets the assessing date. Those sales are significant not only for their impact on the true value of the subject units but for the light they shed on the issue of highest and best use. The post-assessing date Falcon Towers sales are strongly indicative of a trend that became manifest a year before the valuation date, namely, the existence of a market for end users. As those post-assessing date sales corroborate a state of facts existing on the assessing date they are relevant to the issue of the subjects’ true value as well as to the issue of highest and best use. Fort Lee v. Invesco Holding Corp., 3 N.J. Tax 332 (Tax 1981), modified, 6 N.J.Tax 255 (App.Div.1983).
*63 Finally, the expert’s income approach regarding the vacant units and the units occupied by non-senior protected tenants is fatally flawed in that she fails to establish an economic rent for those units. Given the defendant’s vacancy decontrol ordinance, the vacant units could be rented at market levels without the constraints of rent control. The contract rents paid by the protected non-senior tenants are not probative of economic rent for the vacant units as rents paid by protective tenants are controlled. As for the newspaper advertisement concerning apartments for rent, it is settled that rent offerings are not probative of market rents. Irvington v. 1125-1127 Clinton Ave. Associates, 5 N.J.Tax 420 (Tax 1983).
The expert’s income approach concerning the non-senior protected tenants is also beset with critical deficiencies. She equates the contract rents paid by those tenants with economic rent. Implicit in her approach is the assumption that the tenancies will continue indefinitely. Yet the protection afforded by statute expires one year after the assessing date. Given the time required to market any property, plus the interval between contract execution and closing of title, that year will have expired not long before the transfer of ownership. The likelihood that the purchaser will be an end user, not an investor interested in income, is enhanced by the history of Falcon Towers.
Accordingly, the court finds from the credible evidence that the highest and best use of the six vacant units and the nine units occupied by protected tenants is that of owner occupancy, i.e., purchased by end users, not investors, and, therefore, that the most probative method to use in determining the true value of those units is the sales comparison approach.
In this connection the court finds the Falcon Towers sales to be the more probative. All but 2 of the 20 sales utilized by defendant’s expert closed no later then March 16, 1989. Ten of those 20 sales closed in 1988. Closings customarily take place at least two or three months after the execution of binding contracts of sale. Ten of the sales utilized by defendant’s expert occurred *64 more than one year prior to the assessing date (allowing for execution of sales contracts two months before closing). That year saw dramatic changes in the residential real estate market, in particular the market for condominiums. This seriously compromises the comparability of the sales relied upon by defendant’s expert. See Bloomfield Assoc. v. Bloomfield, supra, 12 N.J.Tax at 510; Glenpointe Assoc. v. Teaneck Tp., 241 N.J.Super. 37, 47, 574 A.2d 459 (App.Div.), certif. den., 122 N.J. 391, 585 A.2d 392 (1990).
The Falcon Towers sales, on the other hand, are close in time to the valuation date and the sold units are located in a building in close proximity to Prospect Towers. The adjustment made by plaintiffs expert for the superiority of the subject units is reasonable. The negative adjustment for refurbishing, however, will be $5,000, the figure supported by the credible evidence. That adjustment will be applied to all the units occupied by protected non-senior tenants and to three of the vacant units (8C, 12F and 14D). In view of the imminent expiration of the statutory protection period, the court will apply no discount for occupancy by protected non-senior tenants.
The court finds the true value of the six vacant units and the nine units occupied by protected tenants to be as follows:
Unit # True Value
2H $63,900
8C 68,000
9F 73.000
12F 68.000
14D 58.900
16C 73.000
3C 68.000
BL 68,000
8F 68,000
9C 68,000
12C 68,000
14E 58.900
14G 58.900
15D 58.900
16G 58.900
*65 The five units occupied by protected seniors are entirely different from the other units. Seniors are entitled to the protection of the Senior Citizens and Disabled Protected Tenancy Act, N.J.S.A. 2A:18-61.22 et seq. (the act). Under that legislation tenants 62 years of age or older with annual household incomes not exceeding the greater of three times the average per capita income in the county or $50,000 may remain in oceupancy for 40 years from the date of conversion recording, which is the date of a filing of the master deed for a condominium or the first deed of sale to a purchaser of an individual unit. N.J.S.A. 2A: 18-61.24, -61.25, -61.32. During the protected tenancy period the senior-occupied unit remains subject to rent control if the municipality has a rent control ordinance. N.J.S.A. 2A:18~61.28.
The record indicates that the tenants occupying the five units in question all qualify as seniors entitled to the protection of the act.
As this court observed in Bloomfield Assocs. v. Bloomfield, supra, the determination of highest and best use is made almost by default. 12 N.J.Tax at 509. The seniors cannot be evicted except for non-payment of rent so their units cannot be sold for occupancy by the purchasers; they can only be sold to investors. Thus, the court finds that the highest and best use of the five units occupied by protected seniors is for investment, not for owner-occupants. As the senior units are income-producing property the most appropriate valuation approach is the income method. Helmsley v. Fort Lee, 78 N.J. 200, 394 A.2d 65 (1978). Inquiry under that method begins with the economic rent.
Plaintiffs expert considered the contract rents to be the economic rent for each unit. Her conclusion finds support in the fact that the senior units remain subject to rent control, and there is no evidence to indicate that defendant’s rent control ordinance *66 would permit plaintiff to charge higher rents. Thus, the court finds that the contract rent for each unit is the economic rent.
The expert’s assumptions concerning expenses, namely maintenance, repairs and insurance, are supported by the record.
Her capitalization rate is developed by means of a band of investment, mortgage-equity technique. In this connection she assigns a 75% position to the mortgage and 25% to the equity. She assumes a 12% interest-only mortgage and an 11% equity return. She chose a 12% interest-only mortgage because, she testified, that was what plaintiff was paying. The test is what a putative investor would pay for property and how the purchase would probably be financed, not how the present owner financed acquisition of the subject property. This calls for an inquiry into prevailing mortgage rates and terms. In this connection the court will apply its own expertise and refer to the relevant ACLI tables. See Glen Wall Assoc. v. Wall Tp., 99 N.J. 265, 280, 491 A.2d 1247 (1985). Examination of the ACLI data covering loan commitments made in the fourth quarter of 1989 leads to the conclusion that the mortgage position should be 75% and the interest rate 10%. The court also concludes that the mortgage loan would be of the direct reduction variety amortized over a 25-year payment schedule.
The expert’s posited equity dividend rate of 11% reflects the risks accompanying an investment in a rent controlled property with little opportunity for appreciation in value.
The court thus concludes the appropriate capitalization rate to be 15.56%, including the effective tax rate, developed as follows:
75% mortgage—10%—25 years—constant 10.9%— 8.17
25% equity @11% 2.75
Effective tax rate—30.18% of $15 4.64
15.56
Accordingly, the court determines the true value of the senior units to be as follows:
*67 Unit Annual Rent Maint. Insurance Net Income True Value (rounded)
6D 7704 2952 75 4677 $30,000
11F 9837 3684 75 6078 39.000
15C 9996 3684 75 6237 40.000
15F 9996 3684 75 6237 40.000
17B 6684 2952 75 3657 23,500
The final issue to be resolved is plaintiffs entitlement to discrimination relief pursuant to N.J.S.A. 54:51A-6. That statute provides that whenever the Tax Court finds that the ratio of assessed to true value exceeds the upper limit of the common level range the taxpayer is entitled to relief by application of a general average ratio to the true value as found by the court. The common level range is 15% above and below the general average ratio which is the ratio promulgated annually for each taxing district by the Director, Division of Taxation for school aid distribution purposes. N.J.S.A. 54:l-35a. The general average ratio and the upper and lower limits of the common level range duly promulgated by the Director for the defendant taxing district for tax year 1990 are:
Average Ratio Upper Limit Lower Limit
30.18 34.71 25.65
The ratio of assessment to true value lies within the common level range for Units 2H, 8C, 9F, 14D, 3C, BL, 8F, 14E, 14G and 15D. The assessments for those units will therefore be affirmed. The ratio of assessment to true value exceeds the upper limit of the common level range for all the remaining units. The assessments for those units will be reduced by application of the general average ratio to the true values as herein found.
Judgment will be entered in accordance with this opinion.

 Indicates occupancy by tenant entitled to post-conversion protection pursuant to N.J.S.A. 2A:18-61.1(k), -61.2(g), -61.10 and -61.11.

 Indicates tenant whose occupancy is protected by Senior Citizens and Disabled Protected Tenancy Act, N.J.S.A. 2A: 18-61.22 et seq.

 Even though the sale took place in close proximity to the assessing date, the court does not regard the sale price as probative of true value of any of the subject units. To begin with, the sale was in bulk and was, for that reason, presumptively discounted. Secondly, there are no proofs from which the court could determine an allocation of the total sales price among the three categories of units, i.e., vacant units, units occupied by protected non-senior tenants and units occupied by protected senior tenants.

 Condominiums are separately assessed. NJ.S.A. 46:8B-19.