ANDREW, J.T.C.
The overriding issue in this local property tax case is one of valuation and requires a determination of which appraisal technique presents the most reliable estimate of the fair market value for property tax assessment purposes for each of 95 townhouses. The Edison Township tax assessor maintains that the sales com *199 parison approach is the most convincing, while the taxpayer’s appraisal expert contends that a hybrid income and sales comparison approach would provide the most appropriate method for estimating the value of each of the townhouses.
The properties involved in this proceeding are 95 individual townhouses that are owned by plaintiff, Chesterfield Associates, each of which was separately assessed by the tax assessor. There are 40 two-bedroom townhouses and 55 three-bedroom townhouses. The tax years at issue are 1990, 1991 and 1992. The townhouses were individually assessed at one of three different levels for each of the tax years.[1]
In 1990, 12 of the townhouses were assessed at:
Land $ 48,700
Improvements 101,400
Total $150,100
Forty-one were assessed for 1990 at:
Land $ 48,700
Improvements 104,000
Total $152,700
The remaining 42 townhouses were assessed for 1990 at:
Land $ 48,700
Improvements 107,900
Total $156,600
Plaintiff appealed these assessments and the Middlesex County Board of Taxation entered judgments for 1990 dismissing each of *200 the petitions without prejudice.
In 1991 and 1992, 12 of the townhouses were assessed at:
Land $ 41,800
Improvements 98,200
Total $140,000
Forty-one were assessed for 1991 and 1992 at:
Land $ 41,800
Improvements 100,700
Total $142,500
The remaining 42 townhouses were assessed for 1991 and 1992 at:
Land $ 41,800
Improvements 104,500
Total $146,300
With respect to the 1991 and 1992 tax years, plaintiff, again, appealed the assessments and the Middlesex County Board of Taxation, again, entered judgments dismissing each of the petitions without prejudice, thus permitting the filing of complaints with this court. Plaintiff, for each tax year at issue, filed a timely complaint in this court challenging the assessment of each of the 95 townhouses.
It is evident, and undisputed by the parties, that the appropriate assessment ratios to be employed in this case are those set forth by the Director of the Division of Taxation pursuant to chapter 123, N.J.S.A 54:l-35a, :51A-6(b). For the 1990 tax year, the appropriate average ratio for Edison was 98.66% with an upper limit, pursuant to N.J.S.A 54:51A-6(b), of 100% and a lower limit of 83.86%. For 1991, the average ratio for Edison was 98.91% with an upper limit of 100% and a lower limit of 84.07%. In 1992, the appropriate average ratio was 97.76% with an upper limit of 100% and a lower limit of 83.10%.
In lieu of trial, this matter was submitted to me on a stipulation of facts and a number of exhibits which the parties agreed would constitute the entire record in this proceeding. The exhibits *201 consisted of the appraisal reports of plaintiffs appraisal expert for each of the tax years at issue, a certification by plaintiffs appraisal expert, and the certification of defendant’s tax assessor. Additionally, counsel for the parties submitted legal memoranda to support their respective positions.
The record, as presented, reveals that the parties were in substantial agreement regarding the description of the 95 townhouses and the immediate environs. As indicated by plaintiffs appraiser, these townhouses are located on both the north and south side of Hana Road and the south side of Ethel Road between Taylor Road and Victoria Court in a relatively large residential area in Edison Township. As of October 1, 1989, the first assessment date implicated in this matter, the townhouses constituted a legally permissible conditional use in what was then an RB-TH (residential-townhouse) zoning district. Without contradiction, however, defendant noted that the zoning was changed in December 1989 to residential B-townhouse, a zone in which the only permitted use is a townhouse dwelling and its customary and incidental accessory uses.
The subject townhouses, as previously mentioned, are divided into two sizes. There are 40 two-bedroom units and 55 three-bedroom units. Each of the two-bedroom units consists of 1,760 square feet of living area, while each of the three-bedroom townhouses consists of 1,804 square feet of living area. Each has, in addition to the stated bedrooms, a basement (some finished, some unfinished), living room, dining room and kitchen. The two-bedroom townhouses have one and a half baths, while the three-bedroom units have two and a half baths. Additionally, each townhouse has an attached one-car garage and is serviced by all public utilities including water, sewer, electric, gas and telephone. Although there is nothing in the record to indicate that plaintiffs appraisal expert inspected each of the townhouses, he expressed the opinion that the overall condition of the townhouses was, in general, good and well maintained.
The immediate area consists of 1,753 residential units comprised of 350 rental townhouses in a complex identified as Oxford Arms, *202 390 apartments in the Blueberry Village complex, 335 townhouses in the Victoria Park development, a 218-unit condominium complex in Edison Manor, 365 condominium units in the Edison Village complex, and the 95 townhouses that are the subjects of this proceeding.
The townhouses at issue in this case were constructed by the present plaintiff, Chesterfield Associates, in 1982-1983. According to plaintiffs appraiser, although Edison Township approved the construction of 95 individual townhouses and the property was registered as such with the New Jersey Department of Community Affairs on October 21,1983, plaintiff has operated the entire 95 townhouses as an apartment or rental complex since the completion of construction. Apparently, again according to plaintiff’s appraiser, the market conditions at that time dictated plaintiff’s decision to rent rather than sell the individual units, because there was then a large inventory of residential units available. Presumably, the allegedly pragmatic approach was to hold the townhouses for rental instead of for sale.
The stipulation of facts submitted by the parties sets forth the agreement of the parties as to the appropriate values to be employed by me depending upon which approach to valuation is determined to be appropriate. First, the parties stipulated the unadjusted values to be ascribed to each of the townhouses pursuant to a sales comparison approach based on 45 sales of townhouses in Edison. Specifically, it was agreed that the sales comparison technique produced an unadjusted fair market value of $142,000 for each two-bedroom townhouse for 1990, $137,000 for 1991 and $131,800 for 1992. With respect to each of the three-bedroom townhouses, the agreed upon unadjusted values were $145,600 for 1990, $140,600 for 1991 and $135,400 for 1992.
Plaintiff, however, contends that the fair market value of each of the townhouses for 1990 was $85,600 for the two-bedroom units and $89,200 for the three-bedroom units. For 1991, plaintiff asserts that the market value of a two-bedroom townhouse was $84,500, while a three-bedroom townhouse had a value of $88,300. For 1992, plaintiff contends that the market value of a two- *203 bedroom townhouse was $85,800. It was Edison’s position that the fair market values of the two- and three-bedroom townhouses were in accordance with the stipulated unadjusted values for each of the tax years in question.
The taxpayer’s appraisal expert, however, was of the opinion that three adjustments were required in order to make the stipulated unadjusted values reflective of fair market values for the townhouses. First, a 10% reduction from the stipulated values was needed to account for differences in the physical condition of the sale properties as compared to the subject townhouses. Second, a negative 15% adjustment was necessary in the stipulated values to account for the fact that the townhouses in issue were occupied by tenants. Third, because of the current use of the 95 townhouses as rental units, it was the opinion of the taxpayer’s appraiser that the adjusted results achieved by the sales comparison approach should be melded or averaged with the results that were achieved through his use of an income approach.
With respect to the income approach analysis performed by plaintiffs appraiser, although Edison denied that an income approach was applicable, the parties stipulated that if an income approach were deemed to be appropriate, the values determined by plaintiffs appraiser were correct. Nonetheless, Edison’s position was that the income approach was clearly an inappropriate means of estimating the value of each of the 95 townhouses.
Thus, the valuation questions which this court must decide are: (1) should there be an adjustment in the stipulated values for physical condition and if so, to what extent; (2) should there be an adjustment in the stipulated values for tenant occupancy, and if so, to what extent; and (3) does the sales comparison approach properly reflect the value of each of the 95 townhouses, or, because of market conditions, must a hybrid approach combining both sales comparison and income approaches be adopted?
/.

Adjustment for physical condition.

The first adjustment, suggested by plaintiffs, expert to the stipulated values, was to account for the difference in physical *204 condition of the 95 townhouses as compared to the sale properties that formed the basis for the parties’ stipulated values by the sales comparison approach. According to plaintiffs expert, the stipulated values should be reduced by 10% to reflect the fact that the subject townhouses were occupied by tenants rather than by owners. Apparently, it was the expert’s opinion that owners take better care of their homes than do tenants.
Plaintiff asserts in its brief that the adjustment is appropriate “because a tenant tends to abuse property to a greater degree than an owner.” There is nothing, however, in the stipulation of facts, the appraisal reports of plaintiffs expert, or the certification of plaintiffs expert that either explains the necessity for the 10% adjustment or provides a basis for the extent of the adjustment.
Although this adjustment would appear to have a theoretical basis, it falls short of satisfying plaintiffs burden of proof. It would be reasonable to assume that tenants might not exercise the same care and maintenance that owner-occupiers would. The incentives in each case are different. The assumption, however, must be supported by proof, in light of the fact that Edison maintains that no adjustment need be made for alleged differences in physical condition.
There are a number of reasons why plaintiff fails to sustain its burden of proof on this issue. First, there is nothing in the record to demonstrate that all of the 45 comparable sales utilized were not also affected by existing tenancies. Plaintiffs appraiser seems to be assuming that all of the comparable sales properties were not previously occupied by tenants, but there is nothing in the record to support this assumption. There is no evidence at all on this point. Absent proof in this regard, there is no factual basis for an adjustment.
Second, there is nothing in the record that demonstrates that plaintiffs appraiser inspected each of the townhouses at issue (or any of the comparable sales properties, for that matter) to determine the actual condition of each. Therefore, any adjustment with regard to these units is pure speculation.
*205 Moreover, there is nothing in the record to support the use of an average adjustment as employed by plaintiffs expert. It assumes that the condition of each of the subject townhouses is the same. Absent proof in this regard, that assumption is simply not credible.
Lastly, there is nothing in the record to support the extent of the adjustment. Even if an adjustment for condition was appropriate, there is absolutely no basis upon which to determine the appropriate amount or percentage on the evidence submitted. The 10% adjustment for physical condition is, therefore, rejected.

II.

Adjustment for occupancy by tenants.

The second adjustment which plaintiffs expert deemed appropriate was a 15% reduction in the stipulated sales comparison approach values to account for the occupancy of the townhouses by tenants. Plaintiffs expert did not explain the basis for this adjustment other than to state that “[t]he sales were adjusted downward because the subject units were occupied by tenants on the date of valuation.” Plaintiff, in its brief, expresses the view that the 15% adjustment was made by plaintiffs appraiser because “the mere fact that a unit was occupied by a tenant would create some reluctance on the part of the prospective buyer which would have an impact on the sales price.”
The taxing district maintains that no adjustment should be permitted for tenant occupancy in this case. I am in agreement with the position of the taxing district. To begin with, as previously noted, plaintiffs appraiser, in making this adjustment, is assuming that none of the comparable sales properties was occupied by tenants at the time of the sales. There is no evidence in the record to support this assumption. Therefore, any adjustment in this regard is pure conjecture and speculation.
Second, plaintiffs expert has not specified any statutory or regulatory provision in his appraisal reports or certification that would govern tenant occupancy or eviction with regard to any of *206 the townhouses. Apparently, the adjustment is based on the unsupported assumption that the existing tenancies would affect market value.
Plaintiff seeks to support its expert’s adjustment through its legal memorandum. Plaintiff argues that it is not clear whether the tenants of the townhouses in this proceeding would be entitled to a two-month notice for possession at the termination of the existing leases pursuant to N.J.S.A 2A:18-61.1(Z) and—61.-2(f)[2], or a minimum three-year notice for possession pursuant to N.J.SA 2A:18-61.1(k) and -61.2(g). The latter statutory provisions of the anti-eviction law apply when an owner seeks to’ convert a building from the rental market to condominium or .cooperative status. Inasmuch as the 95 townhouses in issue were approved and constructed as individual single-family dwellings, plaintiff does not seriously contend that the minimum three-year notice provision applies in this case, but rather asserts that the tenants might claim protection under this provision and seek extended tenancies from the court. See G.D. Management Co. v. Negri, 182 N.J.Super. 409, 413, 442 A.2d 611 (App.Div.1982) (three-year notice only applies to pre-conversion tenants).
There simply is no market evidence in the record that demonstrates that tenant occupancy has any effect on the price that a prospective purchaser would pay for one of the subject townhouses.
I find that there is no factual basis for the second adjustment made by plaintiff’s expert. The alleged support is all supposition and speculation. There is nothing in the record to justify an *207 adjustment for tenant occupancy much less one of the magnitude of 15%.[3]
Inasmuch as there is no basis in the record for the 15% adjustment for tenant occupancy, it is rejected.[4]

III.

Hybrid approach to value.

It has become well established that there is no single authoritative approach to the valuation of real property. Much depends on the character of the property and the market data available. In this case, Edison’s tax assessor was of the opinion that the fair market value of each of the 95 townhouses would best be reflected by a sales comparison approach because there was a sufficiently active market for townhouses during the relevant periods. That market demand, according to the tax assessor, was indicated by: (1) the construction and sale of 397 new condomini *208 urns and townhouses in Edison during the period of 1989 to 1991 (260 in 1989, 95 in 1990 and 42 in 1991); (2) the resale data for condominiums and townhouses in Edison revealed there were 219 sales in 1990 and 229 in 1991; and (3) the sales data from Piscataway Township, a community adjacent to Edison, reflected 36 sales in 1990 and 195 in 1991. Included in the Edison data are the 45 townhouse sales which formed the basis for the values stipulated by the parties based solely on a sales comparison approach.
As previously noted, it was Edison’s position that the stipulated values, unadjusted, were the best indication of fair market value for each of the 95 townhouses in issue. Plaintiffs expert, however, was of the opinion that the most appropriate way in which to value the townhouses was by means of a hybrid approach that averaged the results achieved by a sales comparison approach and an income approach.
The record reveals that' plaintiffs appraisal expert viewed the 95 townhouses as a single entity, ie., a single residential complex with 95 townhouse units. His conclusion as to highest and best use reflected this concept. He believed that the highest and best use of the “property” was a continuance of the existing income-producing or rental use until such time as the market would permit selling all of the units. This conclusion, according to the expert, was based upon the following facts: (1) since 1983 when construction was completed, the property has been operated as an income-producing entity; (2) none of the townhouses has ever been offered for sale on an individual basis; and (3) apparently, the residential market in Edison during the relevant period did not justify an attempt to sell all of the townhouses on an individual basis. Thus, it was his opinion that an income approach would be applicable.
On the other hand, however, he believed that he could not ignore the potential that the subject property had for individual single-family ownership, nor could he ignore the sales of townhouses that were occurring in the immediate area. Therefore, he was of the opinion that both an income analysis and a sales *209 comparison could be utilized as components in a hybrid approach to value. He concluded that the appropriate way to value the 95 townhouses would be to average the results obtained through each of the two approaches.
Based on the record in this matter, I am not in agreement with the hybrid approach employed by plaintiffs appraisal expert. It is my opinion that the sales comparison approach fully reflects the value of each of the 95 townhouses and that market conditions did not dictate a melding of the value estimates derived from a sales comparison approach with an income analysis.
To begin with, it is commonly accepted that the sales comparison approach “provides the primary indication of market value” for single-family residential properties so long as there is an adequate number of sales. Appraisal Institute, The Appraisal of Real Estate 368-69, 403 (10th ed. 1992). Moreover, since the sales comparison approach will fully reflect the balance of supply and demand in actual trading in the market place, it develops a most acceptable and convincing reflection of fair market value. Id. at 367-70, 403; George F. Bloom & Harry S. Harrison, Appraising the Single Family Residence 241-42, 265, 294 (1978). Conversely, single family dwellings are not generally suited to an economic or income analysis. The Appraisal of Real Estate, supra at 369; Bloomfield Assocs. v. Bloomfield, 12 N.J.Tax 501, 509 (Tax 1992).
The differences in opinion in this case are attributable to the manner in which the parties perceived the valuation problem. Essentially, plaintiffs expert thought of the subject as a single income-producing residential complex with 95 units, but having the potential for sales as individual units when market circumstances warranted sales.[5] In contrast, Edison’s tax assessor viewed the *210 townhouses as nothing more than 95 individual single-family dwellings that were simply owned by the same entity. The assessor’s approach was to take each individual townhouse and estimate its value as of the appropriate assessment date by the most direct and probative method, ie., a sales comparison approach. The assessor was of the opinion that the sales in the record were sufficient to reflect not only the highest and best use[6] of each townhouse but also each townhouse’s value.
Plaintiffs appraiser disputed not only the tax assessor’s conclusion that the highest and best use of each townhouse was as an owner-occupied, single-family dwelling, but also the assessor’s opinion that a sales comparison approach, alone, was appropriate. Plaintiffs appraiser believed that there was insufficient market demand for all the townhouses as of the relevant assessment dates. His conclusion was based on a comparison of condominium and townhouse sales in Edison with the total number of condominium and townhouse units listed for sale during 1990 and 1991. This study, according to plaintiffs expert, revealed that “in 1990, sales averaged approximately 16.7 per month or approximately 6.7% of the units available for sale for each month. In 1991, sales averaged approximately 16.4 per month or approximately 8.5% of the units available for sale during each month.” These data were offered to support the opinion of plaintiffs expert that the market would not sustain the sales of all 95 units at any one time.
Plaintiff’s expert assumed a sale of all 95 townhouses at one particular time and it was his opinion that all the townhouses were not capable of being sold on any of the assessment dates for the prices that were being obtained for comparable townhouses. This assumption overlooks two important matters. First, the sale that is contemplated by the statutory criterion, N.J.S.A. 54:4-23, *211 is a hypothetical sale. See CPC Int’l, Inc. v. Englewood Cliffs, 193 N.J.Super. 261, 268, 473 A.2d 548 (App.Div.1984). The sale need not actually take place.[7] Second, the valuation problem is not to find the aggregate value of all 95 townhouses assuming they were all offered for sale at the same time, but rather to estimate the value of one townhouse hypothetically for sale. That process would then be repeated 94 more times. The valuation question presented in this case can be answered by determining the price for which each townhouse would sell on October 1 of the pretax year.
Plaintiffs expert seeks to burden the sale of any one individual townhouse by assuming that all 95 townhouses would be put on the market for sale at the same time. As a result, there would be an insufficient market demand to absorb all of the units as of the respective assessment dates.[8] As previously indicated, however, the valuation problem is not to estimate the value of an investment package consisting of 95 townhouses, but instead to estimate the value of one townhouse at a time. This is not a radical concept. If 95 individual owners of single-family dwellings in the same neighborhood all challenged their property assessments, this court would not realistically consider an argument that appropriate values could only be determined if it were assumed that all 95 property owners were going to sell their homes at the same time, and thus, increase supply in relation to demand and consequently *212 lower price.[9]
Inasmuch as this argument would not be acceptable with 95 different owners of single-family dwellings, the mere fact that all of the dwellings were owned by one individual is simply not relevant. See, e.g., Cigolini Assocs. v. Fairview, 208 N.J.Super. 654, 665, 506 A.2d 811 (App.Div.1986).
Moreover, the market demand statistics offered by plaintiffs expert are only valid if one perceives the valuation problem as estimating the value of a 95-unit townhouse complex rather than the much less complex problem of estimating the value of a single townhouse in 95 different local property tax cases. In this proceeding, the problem is correctly perceived as the valuation of one townhouse in 95 different cases. The sales data in the record is more than sufficient to demonstrate the fair market value of any one townhouse. See Byrl N. Boyce & William N. Kinnard, Jr., Appraising Real Property 174 (1984) (“Conventional wisdom has long held that three to four good comparable sales transactions are sufficient to do an appropriate job of representing the competitive market.”).
Plaintiff, in its brief, concedes that a market for individual townhouses existed in Edison for the relevant periods. Plaintiff, however, insists that one must focus on the question of whether there was a market for all 95 townhouses as of the relevant assessment dates. The answer to this question may be that there may not have been a sufficient market to absorb all 95 units at any one time, but that question and answer are irrelevant because the value of a 95-unit townhouse complex is hot the present valuation problem.
*213 Plaintiff also argues that the decision of this court in Bloomfield Assocs. v. Bloomfield, 12 N.J.Tax 501 (Tax 1992), supports its position in this case. Bloomfield Assocs. concerned the valuation of 312 unsold units in what was characterized as a “failed condominium” conversion. Id. at 505. As of the assessment date, all but 87 of the units were occupied by tenants whose occupancy was protected either by the Senior Citizens and Disabled Protected Tenancy Act, N.J.S.A. 2A:18-61.22 et seq. or the Anti-Eviction Act, N.J.S.A 2A:18-61.1 et seq.
With respect to those 87 vacant units, the owner insisted that the highest and best use was for investment, and therefore, the income approach should be of preponderant influence. The taxing district’s expert argued that a sales comparison approach, based on 75 sales of units within the condominium complex itself, should be the controlling approach. Despite the existence of 75 sales of units within the complex, Judge Crabtree of this court concluded that the evidence did not indicate a market demand for the 87 vacant units as owner-occupied dwellings at the relevant assessment date. Therefore, the highest and best use of these units was for investment, and accordingly, the use of an income approach to value was necessary. Id. at 509-10. Plaintiff, in this case, contends that the sales activity in Edison, as in Bloomfield Assocs., was minimal, and thus, the highest and best use of the 95 townhouses can only be a continuation of the existing rental use with eventual sales in the future.
Plaintiff misperceives the highest and best use conclusion in Bloomfield Assocs. Judge Crabtree reached this conclusion because of the lack of relevant evidence in the record supporting a different highest and best use.[10]
The 75 sales presented by the taxing district’s expert were not probative of highest and best use and consequently, value, because they occurred at a time too remote from the assessment date at issue. Id. at 510. It was not Judge Crabtree’s conclusion that 75 *214 sales of comparable units were insufficient to indicate market demand for those units as owner-occupied dwellings, but instead that the sales were inappropriate because of significant changes in market prices that occurred between the dates of the sales and the assessment date at issue.
This is made perfectly clear in Double R Enterprises v. East Orange, 13 N.J.Tax 54 (Tax 1993), also decided by Judge Crab-tree, and involving the valuation of another failed condominium conversion. This case concerned the valuation of 20 condominium units. On the relevant assessment date, six units were vacant, nine were occupied by tenants entitled to post-conversion protection under the Anti-Eviction Act, and five were occupied by tenants protected by the Senior Citizens and Disabled Protected Tenancy Act. Plaintiffs expert used both the income and sales comparison approaches to value the units but placed primary reliance on the income approach because she had concluded that the highest and best use of the units was for investment, not owner occupancy.
Judge Crabtree rejected the expert’s conclusion with respect to the vacant units and those units occupied by tenants protected under the Anti-Eviction Act, because there was evidence of sales to owner-users of 22 condominium units in a condominium complex across the street from the subject complex which occurred in a period that bracketed the assessment date in issue.
Judge Crabtree observed that the 22 sales were “significant not only for their impact on the true value of the subject units but for the light they shed on the issue of highest and best use.” Id. at 62. Based essentially on the 22 sales, Judge Crabtree concluded that the highest and best use of the six vacant units and the nine units occupied by tenants protected by the Anti-Eviction Act was that of owner-occupancy, and therefore, the “most probative method to use in determining the true value of those units is *215 the sales comparison approach.”[11] Id. at 63. The same conclusion is appropriate in this proceeding.
Additionally, the cases of Tall Timbers, Inc. v. Vernon Tp., 5 N.J.Tax 299, 305-08 (Tax 1983) and Cigolini Assocs. v. Fairview, supra, fully support the conclusion I have reached in this case. In Tall Timbers, the court had to consider the value of 296 campsites in a condominium campground community. The developer, Tall Timbers, Inc., had sold a number of these campsites, but owned 69 at the time of the hearing. The appraisal experts were of the opinion that the 69 unsold campsites could be valued by a sales comparison approach but should be discounted over the period of time it would take the developer to sell the remaining campsites.
Judge Lasser of this court rejected the concept of discounting the unsold campsites because each campsite had to be separately assessed according to the same standard of market value. Id. at 306. To permit discounting “would result in a lack of uniformity between these campsite assessments and other assessments in the taxing district.”[12] Id. at 307. The court concluded that “[ujniformity of assessment requires [a] separate valuation of each campsite, whether one person owns one or many.” Ibid.
Plaintiff concedes that each individual townhouse in this case must be separately assessed, but insists that that concept does not dictate the use of a sales comparison approach. Plaintiff asserts that each townhouse can be separately assessed and uniformity of assessment among the units can be achieved by means of its expert’s hybrid approach.
*216 The flaw in plaintiffs argument is readily apparent. While the hybrid approach may be used to produce uniformity of townhouse assessments within the subject complex itself, there will be a lack of uniformity with those comparable townhouses that are individually owned and occupied outside the subject complex.[13]
In Cigolini, supra, the Appellate Division noted that the subjects of the proceeding were 19 residential condominiums, yet the Tax Court had determined the value of the building as a single entity pursuant to an income approach. In rejecting the Tax Court’s methodology, the appellate court observed that, since there were 19 individual condominiums, each must be separately valued and assessed. 208 N.J.Super. at 664-65, 506 A.2d 811. The fact, that plaintiff owned all 19 units was considered irrelevant since plaintiff was to be considered the owner of 19 separate properties. Id. at 665, 506 A.2d 811. In the words of the court:
If we reached any other conclusion we would contravene the policy of this State to place condominium owners on the same legal basis, insofar as consistent with the special problems of condominiums, as other owners of real property.

mm

The hybrid approach employed by plaintiffs expert in this case makes sense only if one views the 95 townhouses as a single entity, i.e., one investment package. If we focus instead on one townhouse and repeat that process as many times as necessary, each townhouse is simply a single-family dwelling whose value is most appropriately determined by a sales comparison approach. *217 Tall Timbers and Cigolini required not only separately stated values and assessments, but also that each unit, whether a campsite, condominium, or as in this case, a townhouse, be viewed as the individual entity and valued as such without considering the fact that the owner may own a large number of other similar units.
For the reasons expressed, I conclude that the values of the townhouses shall be in accordance with the unadjusted, sales-comparison-approach values stipulated by the parties. Inasmuch as these values are less than the assessments for each tax year at issue and chapter 123, N.J.S.A. 54:51A-6(b), dictates generally,[14] in such circumstances, that the average ratio for the taxing district shall be applied, judgment will be entered in accordance with a schedule which has been made a part of the record in this case;

 Although there were only two-bedroom and three-bedroom townhouses, the assessments were made at three levels. For 1990, the record reveals that, of the 40 two-bedroom townhouses, 36 were assessed at $152,700 and 4 were assessed at $156,600. With respect to the 55 three-bedroom townhouses, 12 were assessed at $150,100, 5 at $152,700 and 38 at $156,600. For tax years 1991 and 1992, of the 40 two-bedroom townhouses, 36 were assessed at $142,500 and 4 at $146,300. With respect to the 55 three-bedroom townhouses for 1991 and 1992, 12 were assessed at $140,000, 5 at $142,500 and 38 at $146,300.

 N.J.S.A. 2A: 18-61.2(f) provides for two-months notice in cases where N.J.S.A. 2A: 18—61.1 (Z) is used to evict tenants. N.J.S.A. 2A: 18—61.1 (Z )(1) and (Z )(2) allow for eviction with two-months notice after the owner has contracted to sell the unit to a buyer who wants to personally occupy it. See, e.g., Veltri v. Norwood, 195 N.J.Super. 406, 479 A.2d 931 (App.Div.1984).
Despite this notice requirement, the appraiser’s adjustment is still not warranted. Considering the time to market the property, execute the contract and close title, two-months time should have no impact on market price. In any event, there is no evidence in the present record that shows that a two-month notice period affects market price or value.

 This court is aware of the decisions which have permitted a reduction in fair market value for local property tax assessment purposes due to statutorily created leasehold interests. See Schwam v. Cedar Grove Tp., 9 N.J.Tax 406 (Tax 1987), aff'd, 228 N.J.Super. 522, 550 A.2d 502 (App.Div.1988) (Proper value of condominium units was price paid in light of restrictions imposed by the Senior Citizens and Disabled Protected Tenancy Act, N.J.S.A. 2A:18-61.22.); Berkley Arms Apartment Corp. v. Hackensack, 6 N.J.Tax 260 (Tax 1983) (The record supported an adjustment for a four-year holdover period created by the anti-eviction law, N.J.S.A. 2A:18-61.1(k), -61.2(g).) These cases, however, had detailed support in the record for the effect of the anti-eviction statutes and the methods by which the quantification was made. In this case, there is no proof that the statutory provisions applicable to the existing tenants impinge on market value. Compare Double R Enterprises v. East Orange, 13 N.J.Tax 54, 56 (Tax 1993) (no discount allowed for occupancy by tenants protected under the Anti-Eviction Act, N.J.S.A. 2A:18- 61(k), -61.2(g), -61.10 and -61.11).

 Additionally, in this case it is the owner who, through its own conscious business decision, voluntarily offered the townhouses for rental purposes and now seeks a reduction in value because of that business decision. It is difficult to distinguish this situation from one in which an owner enters into a disadvantageous lease. The leasehold interest created by such a disadvantageous lease would not entitle the owner to a deduction from the fair market value. See Lawrence Associates v. Lawrence Tp., 5 N.J.Tax 481 (Tax 1983); Merchandise Mart Associates v. Pennsauken Tp., 3 N.J.Tax 275, 282 (Tax 1981).

 In the words of plaintiff's appraiser:
[I]t is the appraiser's opinion that the highest and best use for the subject property is to operate it as one income producing property with sales of individual condominium units as an eventual highest and best use of the property at some undetermined [sic] time in the future.
[Emphasis added]

 Highest and best use has been defined as:
the reasonably probable and legal use of ... an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value.
[The Appraisal of Real Estate, supra at 275]

 Inasmuch as the sale need not actually take place, one need not consider the cumulative effect of a number of hypothetical sales. As a matter of fact, the assessor is obligated, on a yearly basis, to estimate the value of all of the assessable parcels within the municipality. This process, however, does not require the assessor to consider what effect there would be on market prices if everyone in the municipality were to offer their real estate for sale at the same time nor, for that matter, what effect there would be on market prices if everyone in the State were to offer their real estate for sale at the same time even though all assessments in this State are based on hypothetical sales which N.J.S.A. 54:4-23 directs assessors to construct as of October 1 of the pretax year.

 The certification of the tax assessor clearly demonstrated sufficient market demand for each townhouse as of the respective assessment dates. See Byrl N. Boyce & William N. Kinnard, Jr., Appraising Real Property at 174 (1984).

 R. 8:3-5(a)(2) permits a complaint to include separately assessed properties in separate counts provided that the properties are contiguous and in common ownership. Plaintiff in this case sought review of 95 townhouses in one complaint, and thus, in one hearing. That would not be permissible for 95 different owners of single-family dwellings. Each would be required to file a separate complaint and have an individual hearing. All other things being equal, however, the fact that the procedure is different should not permit a different substantive result.

 As Judge Crabtree put it, the conclusion as to highest and best use was reached “almost by default.” Id. at 509.

 With respect to the units occupied by tenants { rotected by the Senior Citizens and Disabled Protected Tenancy Act, the court found that the highest and best use was for investment, not for owner-occupants. Id. at 62. Even if the record in this case presented evidence of qualified senior tenants, since the subject complex was not a condominium conversion, the Senior Citizens and Disabled Protected Tenancy Act affords no protection to any tenants.

 While the hybrid method employed by plaintiff’s expert does not directly discount the projected sales prices or market values, the averaging of the income approach with a sales comparison approach is nothing more than an indirect way of discounting the sales prices.

 The Edison Township tax assessor’s position on this point of uniformity is obvious. If each of the subject townhouses is capable of being sold on an individual basis as readily as any owner-occupied townhouse—why would each townhouse at issue not fetch a market price equal to an owner-occupied townhouse that is reflected in the townhouse sales in the record? All things being equal, the assessments should be the same—lest the assessor be accused of not performing a constitutionally directed duty—that of assessing all property uniformly according to the same standard of value. See N.J. Const. art. VIII, § 1, ¶ 1(a). New Jersey is not unique in this regard. See Mathias v. Department of Revenue, 11 Or.Tax 347, 1990 WL 47655 (Tax 1990), aff'd, 312 Or. 50, 817 P.2d 272 (1991); First Interstate Bank of Oregon v. Department of Revenue, 10 Or.Tax 452, 1987 WL 42437 (Tax 1987), aff'd, 306 Or. 450, 760 P.2d 880 (1988); Lewis v. Department of Revenue, 10 Or.Tax 128, 1985 WL 6316 (Tax 1985), aff'd, 302 Or. 289, 728 P.2d 1378 (1986); CKW Enterprises v. Department of Revenue, 10 Or.Tax 49, 1985 WL 6304 (Tax 1985).

 For 1991, with respect to 12 of the three-bedroom townhouses, lots 91.A to G and lots 93.A to E, the ratio of the assessed valuation to its true value, 99.57%, and the average ratio, 98.91%, were both below the county percentage level, thus the average ratio was not used to revise the true value of the property. See Frieman v. Randolph Tp., 8 N.J.Tax 264, 273-74 (Tax 1986), aff'd, 216 N.J.Super. 507, 524 A.2d 453 (App.Div.1987), appeal dismissed, 110 N.J. 294, 540 A.2d 1276 (1988).