HAMILL, J.T.C.
Plaintiff Prudential Insurance Company of America appeals the 1993 and 1994 local property tax assessments on Block 202, Lot 3.9 in Parsippany-Troy Hills Township. The property is the Parsippany Hilton located at 1 Hilton Court. For both years, the property was assessed at $25,829,800. With application of the Chapter 123 ratios (54.54% for 1993 and 56.4% for 1994), the indicated equalized value was in excess of $47 million for 1993 and was somewhat less than $46 million for 1994. Plaintiff maintains that the true value of the property as of the relevant assessing dates was $21,545,000 for 1993 and $25,416,000 for 1994. Defendant maintains that the true value was $32,018,000 for 1995 and was $33,315,000 for 1994.
The property is what is known as a full service, first tier hotel. It is located on 15.76 acres. Built in 1981, the hotel has 508 guest rooms, four restaurants, a 10,000 square foot ballroom, 20 meeting rooms, indoor and outdoor pools and other recreational facilities, a gift shop, laundry facilities, and a game room. It is located within the Prudential business campus. Included within the immediate area are approximately five million square feet of first class office space. The property is located on the north side of Route 10 approximately two miles west of Interstate Route 287 and one third of a mile east of Route 202. Interstate Route 80 is also nearby. Due to its location, the property caters primarily to business travelers.
From the opening of the hotel in 1981 to September 1991, Hilton Hotels managed the property. In 1991 Prudential changed management but retained the Hilton name, Hilton reservation service, and Hilton supervision. In return, Hilton receives franchise fees amounting to 5% of gross revenues. Beginning in late 1991, Prudential employed Interstate Management Company to *60 manage the hotel. Under the management agreement entered into in September 1991, Interstate receives a management fee of 3% of gross income and an incentive bonus of 20% of net income. The parties stipulated that Interstate is an expert hotel management firm.
There were many points of agreement between the parties.
They agreed that the highest and best use of the property is its current use. They further agreed that the income approach is the best approach for valuing a hotel because this approach replicates a hotel investor’s analysis. In developing the income approach, both appraisers followed the methodology of Stephen Rushmore to determine net operating income and to eliminate income not attributable to the real estate, ie., income attributable to personal property and to business value. Stephen Rushmore and Karen E. Rubin, The Valuation of Hotels and Motels for Assessment Purposes 198k The Appraisal Journal, 270. Finally, there was little, if any, disagreement concerning expenses as a percentage of gross revenues.
The parties’ major points of disagreement were (1) the appropriate stabilized room revenue, (2) appropriate capitalization rate, and (3) appropriate figure for the return on furniture, fixtures, and equipment. Of these items, the most significant was the appropriate stabilized room revenue.
A determination of stabilized revenue and ultimately stabilized net income is necessary because, in the direct capitalization method, a single net income figure is capitalized in perpetuity to determine value. “The stabilized net income is intended to reflect the anticipated operating results of the hotel over its remaining economic life, given any or all applicable stages of buildup, plateau, and decline in the life cycle.” Rushmore and Rubin, supra at 274.
In order to determine stabilized room revenue, it is necessary to know (1) the number of rooms (here 508), (2) the average daily room rate, and (3) the occupancy rate. Although in agreement as to the number of rooms, the parties sharply disagreed as *61 to the average daily room rate and the occupancy rate. According to plaintiff, the average daily room rate for tax year 1993 was $82 and for tax year 1994 was $84. Defendant maintained that the average daily rate for both years should be stabilized at $90. According to plaintiff the occupancy rate was 60% for tax year 1993 and 63% for tax year 1994. Defendant maintained that the occupancy rate for both years should be stabilized at 65%.
Both appraisers developed their average daily room rates and occupancy rates using the subject’s actual room and occupancy rates as well as the room rates and occupancy rates of allegedly comparable hotels.
The subject’s actual average daily room rates averaged nearly $92 during the period 1986-1990, with a low of $85 during 1988. In 1991, the average daily room rate dropped to approximately $85, dropped to $81 in 1992, was $82 in 1993, and increased to $84.50 in 1994.
Both appraisers agreed that the period 1991-1993 saw a “bottoming out” of the hotel market. The question was how far above the bottom of the market should the stabilized average daily room rate be placed for the 1993 and 1994 tax years. There was no dispute that the competing hotels as a group achieved average daily rates in the $90 and above level. The $90 figure holds true whether the competing hotels are limited to the immediate area ■without regard to whether a particular hotel is full service, as proposed by plaintiffs expert, or whether the competition is limited to full service hotels without regard to proximity, as proposed by defendant’s expert. Plaintiff maintained that the subject could not obtain a $90 average rate because, at over 500 rooms, it is significantly larger than its competition and therefore must offer more rooms at reduced rates to achieve acceptable occupancy levels. Additionally, according to plaintiff, the subject is older than most of the hotels with which it competes for business guests.
As to occupancy rates, although the occupancy rates of the subject may have reached 65% for at least one year in the period 1986-1990, during the period 1991 through 1992, they were in the *62 realm of 53%, increased to 60% in 1993, and increased to approximately 65.5% in 1994. Occupancy rates for the subject’s competition were higher, ranging between approximately 59% in 1991 to 68.5% in 1993. Plaintiff explained the lower occupancy rates of the subject as compared to its competition again on the basis of the fact that the subject is a much larger hotel and is older than most of its competition.
Defendant’s explanation for the discrepancy in average daily room rates and occupancy rates between the subject and its competition was that there was a change in management of the subject in 1991, and that immediately after the change, management was not able to maintain the same levels as its competition. Defendant argued that the value of the subject should be based on the relevant market, i.e., the rates of competing hotels, because otherwise the value of the real estate would vary depending upon the quality of hotel management, a result that would be inconsistent with the Uniformity Clause.
While defendant may be correct as a general proposition, this court has concluded that, insofar as the valuation of hotels is concerned, the value of the real estate is in part attributable to management. Unless there is some indication of poor management (and in this case there is none), the revenues achieved by a particular hotel are indicative of economic rent. [See Westmount Plaza v. Parsippany Troy Hills Tp., 11 N.J.Tax 127, 134-35 (Tax 1990) (finding that operation revenues of the hotel, after stabilization and adjustment are prima facie economic rent);] Glenpointe Assocs. v. Teaneck Tp., 10 N.J.Tax 380, 390 (Tax 1989), aff'd per curiam, 12 N.J.Tax 118 (App.Div.1990). Additionally, plaintiff offered a plausible explanation for the lower average daily room rates and occupancy rates of the subject. The subject has 508 rooms and was built in 1981. Its nearest competitor, the Hanover Marriot, at 353 rooms, is smaller and thus easier to fill, and is somewhat newer, having been built in 1986. The rooms available in the other nearby business hotels ranged from 149 to 383 and, with the exception of the Madison Hotel, all were built subsequent to 1981. Moreover, defendant’s comparable New Jersey hotels *63 were, in part, located at some distance from the subject and its surrounding office space and business parks, and would not have been in competition with the subject for a business traveler.
Defendant’s additional support for an average daily room rate of $90 and an occupancy rate of 65% was a national survey by Pannell, Kerr & Forster (“PKF”) for calendar year 1992. The PKF report showed an average daily room rate of $89.71 and an occupancy rate of 71.2% for first tier, metropolitan area hotels. I cannot accept these figures based on a nationwide survey of hotels because they do not show rates in the North Jersey market where the subject is located. Hotel rates clearly fluctuate from one area of the country to another.[1] Furthermore, no definition of “metropolitan area” as used in the PKF report was offered, and it is questionable whether first tier hotel rates in Parsippany-Troy Hills can be equated with rates in major metropolises such as New York City.
On the other hand, I agree with defendant that the years 1991 and 1992 were the bottom of the market, that the subject’s occupancy and daily room rates were particularly low in the 1991 through 1993 years, and that they should be stabilized at a single figure for both tax years.
As defined by the Appraisal Institute in the The Appraisal of Real Estate (10th ed. 1992), to which defendant’s appraiser referred, “[sjtabilized occupancy or income is defined as occupancy or income at that point in time when abnormalities in supply and demand or any additional transitory conditions cease to exist and the existing conditions are those expected to continue over the economic life of the property.” Id. at 320-21. See also The Dictionary of Real Estate Appraisal (3d ed. 1989) 285 (defining “stabilized income,” and “stabilized occupancy,”) to which defendant’s counsel referred in closing argument.
*64 When the “transitory conditions” of the 1991-1992 period, i.e., the bottom of the hotel market, are eliminated, it appears that an appropriate average daily room rate for the subject is $85, and an appropriate occupancy rate is 68% [for both tax years].
A stabilized average daily room rate of $85 is justified by the fact that in 1988, prior to the steep downturn in the hotel market, the subject achieved a rate of $85, and that in 1994, just after the downturn, the rate again was approximately $85. I am mindful that value should be based on what was known or anticipated on the assessing date. City of New Brunswick v. Division of Tax Appeals, 39 N.J. 537, 545, 189 A.2d 702 (1963). Although 1994 post-dates both assessing dates, in this case the 1994 room rate is corroborative of the 1988 rate that preceded the assessing dates. See Fort Lee Bor. v. Invesco Holding Corp., 3 N.J.Tax 332, 342 (Tax 1981), aff'd in part, rev’d in part on other grounds, 6 N.J.Tax 255 (App.Div.), certif. denied, 94 N.J. 606, 468 A.2d 238 (1983); (stating that “[w]hile the use of subsequent events as direct evidence of value is not appropriate, a valuation predicated upon subsequent events may, in an appropriate situation, be utilized to corroborate an opinion independently arrived at and based on facts known or reasonably ascertainable of the critical date”. Stanford Enter. v. City of East Orange, 1 N.J.Tax 317, 324 (Tax 1980) (stating that “[w]hether such subsequent events, when offered in conjunction with evidence known or reasonably anticipated as of the assessing date, are used in corroboration or as direct evidence is more theoretical than real”). Given the higher average daily room rates in the 1986-1990 period and the slight upturn in rates between 1992 and 1993, an investor reasonably could have anticipated an $85 average daily room rate as of October 1, 1992 and October 1, 1993, the assessing dates for the years in question. Although the average daily room rate averaged nearly $92 during the years 1986-1990, I am not convinced that in future years the subject will be able to achieve anywhere near this rate. Defendant did not provide the actual *65 rates for 1989 and 1990, and the rate was only $85 in 1988 and close to $85 in 1994.
I believe that the subject’s stabilized occupancy rate should be no higher than 63% because defendant’s testimony was vague as to the occupancy rate for the period 1986-1990. At one point defendant’s expert stated that the rate for that period did not exceed 65%, and at another point he stated that the rate was in the 60% category. Although the rate jumped to nearly 65% for the 1994 calendar year, 1994 post-dates the two assessing dates, and use of the 1994 occupancy rate again raises a question about what an investor could have known or anticipated on the assessing dates. New Brunswick v. Division of Tax Appeals, supra, 39 N.J. at 545, 189 A.2d 702. While I would be inclined to use the 1994 rate to corroborate a rate of 65% that predated the relevant assessing dates, I cannot do so because, as I have said, I cannot be certain from defendant’s testimony that the occupancy rate was consistently at least 65% in the 1986-1990 period.
Turning to the return on furniture, fixtures, and equipment, I accept defendant’s view that the base to which a capitalization rate is to be applied should be the actual depreciated book value of the personal property, which defendant determined to be $2,754,352. Plaintiff used a base figure of $3,810,000, derived from the Marshall & Swift cost manual and a depreciation rate of 50%, but this appears to have been due simply to the fact that plaintiff was unable to obtain the actual depreciated book value of the personal property. Plaintiffs Appraisal Report at 47.[2] There was no dispute that the capitalization rate for the real estate was to be used in determining the return on personal property.
The remaining point of dispute between the parties was the capitalization rate. Using data from the Investment Bulletins of the American Council on Life Insurance (“ACLI”), plaintiffs appraiser determined an overall capitalization for both years of 10.5%. The appraiser conceded that there was no data for 1993 to be used in determining a 1994 tax value, so he simply used the *66 rate determined for the preceding year. Defendant proposed an overall rate of 9.31% for the 1993 tax year and a rate of 8.72% for the 1994 tax year.
Defendant maintained that the ACLI data should not be used because the data is not based on actual sales, but rather on real estate loans, and that other sources provide more accurate data. The difficulty with defendant’s argument is that none of the expert’s data appear to be indicative of capitalization rates for hotels and, to the extent that the data are relevant at all, they appear to support a capitalization rate in the range of 10%. In view of this court’s acceptance of the ACLI data as a source for capitalization rates, I conclude that the ACLI tables provide an appropriate guideline in this case. See Glenpointe Assocs., supra, 10 N.J.Tax at 394-96 (taking judicial notice of ACLI data and finding it “widely disseminated, readily available and frequently relied upon by professionals in the local property tax field”). See also Double R. Enter, v. City of East Orange, 13 N.J.Tax 54, 66 (Tax 1993) (referring to ACLI data); Purex Corp. v. City of Paterson, 8 N.J.Tax 121, 131 (Tax 1986) (deeming ACLI data as “acceptable authority” for the rendering of expert opinion).
Due to the high quality of the subject property and the beginning of an upswing in the hotel industry starting in 1993, I conclude that a capitalization rate of 10% for both years is appropriate. Although less than the ACLI indicated rate for the third quarter of 1992 and less than the plaintiffs rate, a 10% rate takes into account the quality of the subject’s facilities and location, as well as the improvement in the subject’s average daily room and occupancy rates in 1993, particularly its occupancy rate. At the same time, the 10% rate reflects the fact that, compared to its competition, the subject is a substantially larger and somewhat older hotel.
While defendant may be correct that mortgage interest rates were lower as of October 1, 1993 than they were in October 1, 1992, and that equity dividend rates were also dropping during this period, the absence of hotel data for the third quarter of 1993, both in plaintiffs and defendant’s reports and testimony, makes it *67 impossible to corroborate this hypothesis. In fact, the absence of hotel loans during the latter period suggests that the hotel market may have only just begun to improve during 1993. I therefore conclude that the capitalization rate should remain the same for the two tax years at issue.
To be added to the capitalization rate for each year is the effective tax rate. During the course of the trial, the parties agreed that the actual tax rate for 1993 was 3.62% and for 1994 was 3.85%. When the Chapter 123 ratios (54.54% for 1993 and 56.4% for 1994) are applied to the actual tax rate for each year, the effective tax rate for 1993 is 1.97% and for 1994 is 2.17%. The resulting overall capitalization rate, including the effective tax rate, is thus 11.97% for 1993 and 12.17% for 1994.
Applying the above conclusions with respect to average daily room rate, occupancy rate, return on personal property, capitalization rate, and effective tax rate, I find as follows:
room revenue for both years $9,929,241
(508 x $85 x 63% x 365)
gross revenue assuming room revenue
equals 52% of gross revenue 19,094,694
gross profit at 51.78% of gross revenue 9,887,233 [3]
undistributed operating expenses at 27.6%
of gross revenue 5,270,136 [4]
insurance at 1% of gross revenue 190,947
management fee at 3% of gross revenue 572,841
return of personal property at 2% of gross
revenue 381,894
return on personal property 275,435
($2,754,352 x 10%)
total deductions from gross profit 6,691,253
net operating income 3,195,980
capitalized at 11.97% for 1993 26,699,916
*68 capitalized at 12.17% for 1994 26,261,134.
As the ratio of assessed value to true value of the property exceeds the upper limit of the Chapter 123 corridor for both years, the assessed value must be reduced by applying the Chapter 123 ratio to true value. When this is done, the assessed value for 1993 is reduced to $14,562,100 rounded, and the assessed value for 1994 is reduced to $14,811,300 rounded.
On the assumption that the land value should remain constant, the revised assessments, broken down between land and improvements are:
1993 1994
Land $1,576,000 $1,576,000
Improvements 12,986,100 13,235,300
Total $14,562,100 $14,811,300
The court will enter judgments accordingly.

 This fact is corroborated in the Arthur Andersen Host Report included in the addenda to defendant’s appraisal report.

 Plaintiff's report states that the figure was derived from a publication of the Hospitality Market Data Exchange, but plaintiff’s appraiser testified that he derived the cost new of the personal property from Marshall & Swift.

 51.78% is the average between plaintiff's percentage of 51.32% and defendant’s figure of 52.2%.

 I have used defendant’s figure of 27.6% for operating expenses as a percentage of total income. Plaintiff’s and defendant’s figures are close, but plaintiff’s presentation is confusing and contains discrepancies between the stated dollar total and the stated percentage total.