TAX COURT OF NEW JERSEY



Joshua D. Novin
Judge

Washington & Court Streets, 1st Floor
P.O. Box 910
Morristown, New Jersey 07963
Tel: (609) 815-2922, Ext. 54680
Fax: (973) 656-4305

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

January 30, 2019

Michael J. Caccavelli, Esq.[1]
Pearlman & Miranda, LLC
2 Broad Street, Suite 510
Bloomfield, New Jersey 07003

William R. Betesh, Esq.
Boggia & Boggia, L.L.C.
71 Mt. Vernon Street
Ridgefield Park, New Jersey 07660

    Re:    Ridgefield Park Lodging Associates v. Village of Ridgefield Park
           Docket Nos. 000078-2010, 004073-2010, and 002857-2011

Dear Mr. Caccavelli and Mr. Betesh:

This letter constitutes the court's opinion following trial of the local property tax appeals in the above matters. Ridgefield Park Lodging Associates ("RPLA") filed complaints challenging the 2009 tax year added assessment, and 2010 and 2011 tax year local property tax assessments on its improved property located in the Village of Ridgefield Park ("VRP"). In response, VRP filed counterclaims charging that the 2009 tax year added assessment, and the 2010 and 2011 tax year local property tax assessments were less than the property's true value.

For the reasons stated below, the court affirms the 2009 tax year added assessment and the 2010 and 2011 tax year local property tax assessments.

---

[1] Ridgefield Park Lodging Associates was represented during trial by Bradley M. Wilson, Esq. and Jacek Zapotoczny, Esq. of Nowell, P.A. On July 9, 2018, Pearlman & Miranda LLC, filed a Substitution of Attorney superseding as counsel for Ridgefield Park Lodging Associates.

## I.    Findings of Fact

Pursuant to R. 1:7-4(a), the court makes the following findings of fact and conclusions of law based on the evidence and testimony adduced during trial.

As of the valuation dates, RPLA was the owner of the real property and improvements located at 70 Challenger Road, Ridgefield Park, New Jersey (the "subject property").[2] The subject property is identified on VRP's municipal tax map as Block 24.02, Lot 1.01.

The subject property is a 3.69-acre irregularly shaped, level parcel, with frontage along Challenger Road. The subject property is visible from and appurtenant to the New Jersey Turnpike extension, and in close proximity to Interstate Route 80 and State Highway Route 46. The subject property is improved with a 76,858 square foot, five-story, Hilton Garden Inn hotel, constructed in 2008, consisting of 140 guest rooms. The hotel amenities include an indoor pool, a fitness center, a business center, a guest laundry center, meeting rooms, a convenience store, a guest lounge area, and on-site dining with breakfast, lunch, and dinner service. On-site parking is available on surface lots adjacent to the hotel. The hotel is constructed of masonry and light steel with exterior walls finished in an insulating finishing system, providing a stucco-like finish.

The subject property is located in VRP's Office Park 1 zoning district, with permitted uses that include motels, hotels, convention centers, theaters, research facilities, and office parks. The hotel is surrounded by a mixture of office buildings, corporate headquarter facilities, and

---

[2] RPLA's Case Information Statements reflect that it was the owner of the subject property during the tax years at issue. Additionally, VRP's expert's report states that RPLA was the "Owner of Record" of the subject property during the tax years at issue. However, during trial testimony was offered by the expert that "Hartz Mountain held a ground lease for this parcel . . . during the years in question, 2009 through 2011." No other testimony or evidence was elicited regarding the alleged ground lease of the subject property.

recreational amenities. Thus, use of the subject property as a hotel is a legal, conforming use. The subject property is not located within a designated flood hazard area.

RPLA filed complaints challenging the subject property's 2009 tax year added assessment, and 2010 and 2011 tax years local property assessments, as being in excess of its true value. VRP filed counterclaims charging that the 2009 tax year added assessment, and 2010 and 2011 tax years local property tax assessments were less than its true value.

## II. Pretrial Proceedings

On January 28, 2016, the court entered a Case Management Order directing RPLA and VRP to exchange trial-ready appraisal reports by no later than May 20, 2016.

On April 12, 2016, RPLA's counsel filed a letter with the court "withdrawing the Complaints" in the above matters.[3]

On May 13, 2016, the court entered Partial Judgments dismissing RPLA's complaints, each containing the notation that "The counterclaim remains open."

Following issuance of the Partial Judgments, RPLA's counsel filed a letter with the court asserting that "we only sought to withdraw the above-referenced complaints on the condition that the Village of Ridgefield Park would withdraw all of its affirmative complaints and counterclaims in this matter. If the Village of Ridgefield Park does not withdraw their affirmative complaints and counterclaims, we request that the above-referenced matters not be withdrawn."

On May 16, 2016, VRP's counsel filed a letter with the court objecting to RPLA's counsel's request to rescind its withdrawal of the complaints in these matters.

---

[3] RPLA's counsel's April 12, 2016 letter also withdrew complaints under docket numbers 006717-2012, 005115-2013, and 000700-2014, which matters were not part of the Case Management Order.

3

By letter dated May 17, 2016, the court notified counsel for RPLA and VRP that "the court will not entertain any requests to vacate the . . . May 13, 2016 [Partial] Judgments entered by the court dismissing the Complaints in the above-captioned matters, absent motions for relief under R. 4:50-1."

VRP did not withdrawal its counterclaims, and no motions were filed by RPLA under R. 4:50-1 seeking relief from the court's May 13, 2016 Partial Judgments.

### III.   Trial

VRP's counterclaims were tried to conclusion.[4]  During trial, VRP offered testimony from a State of New Jersey certified general real estate appraiser, who was accepted by the court, without objection, as an expert in the field of real property valuation (the "expert").  The expert prepared an appraisal report expressing an opinion of the market value of the subject property as of the October 1, 2008, October 1, 2009, and October 1, 2010 valuation dates.

As of each valuation date, the subject property's tax assessment, implied equalized value, and the expert's value conclusion is set forth below:

---

[4] RPLA did not furnish VRP with trial-ready appraisal reports in the above matters.  Accordingly, VRP filed pretrial motions with the court seeking to: (a) suppress any valuation expert report or expert testimony by RPLA; and (b) suppress RPLA's defenses as a result of its failure "to comply with the . . . January 28, 2016 Case Management Order. . ."  RPLA filed opposition in response to the motions.  Prior to commencement of trial the court heard oral argument on the motions.  The court suppressed admission of any valuation expert report or expert testimony on behalf of RPLA.  However, the court denied VRP's motion seeking to suppress or preclude RPLA from raising any defenses.  The court placed a statement of reasons on the record.

| Valuation date | Original Assessment | Added Assessment | Average ratio of assessed to true value | Implied equalized Value | VRP's expert's concluded value |
|---|---|---|---|---|---|
| 10/1/2008 | $10,535,000 | $4,654,300[5] | 100.72% | $15,189,300 | $22,730,000 |
| 10/1/2009 | $15,189,300 | - | 106.94% | $15,189,300 | $20,700,000 |
| 10/1/2010 | $14,203,600[6] | - | 108.19% | $14,203,600 | $20,165,000 |

Following presentation of the evidence, the court afforded counsel for RPLA and VRP the opportunity to submit post-trial briefs and reply briefs pursuant to a schedule assigned by the court. Counsel for RPLA and VRP filed both post-trial briefs and post-trial reply briefs with the court. Subsequently, counsel for RPLA filed motions with the court seeking to reopen and extend discovery and reopen the trial record. After affording the parties several adjournments of the motions' return date, on December 7, 2018, the court entered an Order denying the motions.

IV.     **Conclusions of Law**

A.  Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing [party] has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985) (citing Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 174 (1952)). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998).

---

[5]  The 2009 added assessment was pro-rated over 7 months to $2,715,008.

[6]  VRP's expert's report stated that the subject property's 2011 tax assessment was $14,203,600. However, both RPLA's complaint and VRP's counterclaim reflected the subject property's 2011 tax assessment as $15,189,300.

A party seeking to challenge the local property tax assessment or county board judgment can only rebut the presumption by introducing "cogent evidence" of true value. Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the [offering party] all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38-39 (App. Div. 1982)). Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is nonetheless required to determine if the party challenging the tax assessment has overcome the presumption of validity. If the court independently concludes that it has not carried the requisite burden, dismissal of the action is warranted under R. 4:40-1 and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

6

According VRP all reasonable and legitimate inferences which can be deduced from the evidence presented, the court concludes that VRP produced cogent evidence sufficient to overcome the presumption of validity. If accepted as true, the opinions of VRP's expert and the facts upon which he relied raise debatable questions regarding the correctness of the subject property's tax assessments for the 2009, 2010, and 2011 tax years.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of [the challenging party's] case-in-chief, the burden of proof remain[s] on the [challenging party] . . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15.

B. Highest and Best Use

In attempting to determine the true value of the subject property, consideration must be given to that price which a hypothetical buyer would pay a hypothetical seller, neither of which are constrained to purchase or sell the property, as of October 1 of the pretax year. See Petrizzo v. Edgewater, 2 N.J. Tax 197, 200 (Tax 1981); Genola Ventures v. Shrewsbury Borough, 2 N.J. Tax 541, 551 (Tax 1981). An indispensable element to the process of property valuation and to the determination of a property's true market value is discerning its highest and best use. Ford Motor Co., 127 N.J. 290. See also General Motors Corp. v. Linden City, 22 N.J. Tax 95, 107 (Tax 2005). "For local property tax assessment purposes, property must be valued at its highest and best use."

7

Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000).  Thus, the highest and best use analysis is often referred to as "the first and most important step in the valuation process." Ford Motor Co., 10 N.J. Tax at 161.

The highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). See also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000).

Here, the expert concluded that the "As Vacant" highest and best use of the subject property would be for development with a commercial use in accordance with applicable zoning restrictions.  Moreover, because the subject property is currently developed with a five-story hotel, the expert concluded that continued use of the subject property as a hotel represents its highest and best use "As Improved."  The court concludes that the expert's highest and best use conclusions are reasonable and supported by the record.

  C.  Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. Garfield City, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980).  "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001) (internal citation omitted)).  The "decision as to which valuation approach should predominate depends

upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)). See also WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax, 610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986).

Here, the expert relied exclusively on the income capitalization approach to derive an opinion of true value for the subject property.

### 1. Income Capitalization Approach

When a property is income producing, the income capitalization approach is the favored method for determining the estimated value of that property. Parkway Village Apartments Co. v. Cranford Twp., 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Fort Lee Borough, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Princeton Borough, 16 N.J. Tax 68 (Tax 1996). "The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." The Appraisal of Real Estate, 439.

Direct capitalization is a technique frequently employed by this court and valuation experts "to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate, at 491; Hull Junction Holding Corp., 16 N.J. Tax at 80-81. Thus, the capitalization rate is the device that converts a property's Net Operating Income into an estimate of value.

9

Here, the subject property is not income producing in the traditional sense, inasmuch as the owner is not receiving income from the rental of the real estate. Rather, income is being generated by operation and management of the hotel on the subject property. Thus, when attempting to derive the value of a hotel under the income capitalization approach, an appraiser must segregate the income that is attributable to use of the real property, from the income that is generated by business operations of the hotel, before capitalization. Chesapeake Hotel LP v. Saddle Brook Twp., 22 N.J. Tax 525, 527 (2005).[7] In the expert's opinion, because the income capitalization approach is the "primary approach, which purchasers would look at in the purchase of a hotel like the subject property," he concluded that it was the most reliable indicator of market value.

a. Discussion

To discern a market value for the subject property under the income capitalization approach, the expert embraced the "Rushmore method," which can be summarized as follows: (1) compute gross stabilized revenues from guest room rates and occupancy rates, including additional revenues derived from food and beverage service, and other revenue sources; (2) deduct stabilized departmental expenses, including expenses associated with guest rooms, food and beverage, complimentary services, administrative expenses, franchise fees, sales and marketing, and property operations; (3) deduct a percentage of gross revenues allocated to hotel management, accounting, and other fixed expenses, thereby generating an estimated Net Operating Income; (4)

---

[7] This approach to valuing hotels, often referred to as the "Rushmore method," has been adopted by our courts. See Glenpointe Assocs. v. Teaneck, 10 N.J. Tax 380 (Tax 1989), aff'd, 12 N.J. Tax 118 (App. Div. 1990); Prudential Ins. Co. v. Parsippany-Troy Hills Twp., 16 N.J. Tax 58 (Tax 1995), aff'd, 16 N.J. Tax 148 (App. Div. 1996); Chesapeake Hotel LP, 22 N.J. Tax 525; City of Atlantic City v. Ace Gaming, LLC, 23 N.J. Tax 70 (2006).

deduct an amount for structural reserves, a return of furniture, fixtures and equipment ("FF&E")[8], and return on FF&E[9]; and (4) apply a capitalization rate to the Net Operating Income.

However, because the subject property's hotel did not commence operations until approximately April 2009, the expert did not possess actual annual income and expense information for the subject property as of either the October 1, 2008 valuation date, or as of the October 1, 2009 valuation date.[10] Accordingly, for the 2009 and 2010 tax years, the expert relied on income data procured from Smith Travel Research ("STR"), for five hotels that he identified in Bergen County, New Jersey. The five identified hotels were: (i) the Hilton Hotel in Hasbrouck Heights, a 355 room hotel, opened in 1974; (ii) the Holiday Inn in Hasbrouck Heights, a 245 room hotel, opened in 1967; (iii) the Marriott Hotel at Glenpointe in Teaneck, a 345 room hotel, opened in 1983; (iv) the Hampton Inn in Ridgefield Park, an 84 room hotel, opened in 1998; and (v) the Crowne Plaza in Englewood, a 194 room hotel, opened in 1989 (the "comparative hotel set"). In addition, the expert procured expense data from PKF Hospitality Research ("PKF"), to estimate stabilized operating expenses.[11]

---

[8] The return of FF&E component "is based on the replacement cost of the chattels and their estimated useful lives." Rushmore, The Appraisal Institute, Hotels and Motels, Valuations and Market Studies, 103 (1983). This assumes that FF&E has a short life and an expense accounting for its periodic replacement is necessary.

[9] The return on FF&E component "is based on the premise that a component of a property is entitled to an annual return equal to the cost of the capital comprising that component." Rushmore & Rubin, The Appraisal Journal, The Valuation of Hotels and Motels For Assessment Purposes, 283 (April 1984). This assumes that a portion of the gross revenue realized by a hotel are attributable to use of FF&E, and a deduction must be made to account for its present value.

[10] The expert provided income and expense information for the "trailing 12 months" from May 2010, which apparently included June 2009 through May 2010, but did not provide the occupancy rates, average daily guest room rates, or revenue, per available guest room, during that period.

[11] STR and PKF are fee-based service providers who collect, benchmark, and analyze data on hotels and motels worldwide.

As of the October 1, 2010 valuation date, the expert similarly relied on the STR and PKF data. However, the expert also compared the published data of the comparative hotel set with the subject property's actual reported income and expense information for the years ending 2011, 2012 and 2013, periods after the valuation dates at issue.

According to the expert, the STR reports disclosed that the comparative hotel set experienced: (i) an average daily room rate of $143.73, and average occupancy rate of 73.5%, for the 2008 calendar year; (ii) an average daily room rate of $119.70, and average occupancy rate of 59.1%, for the 2009 calendar year[12]; (iii) an average daily room rate of $119.40, and average occupancy rate of 69.9% for the 2010 calendar year.[13]

Therefore, as of the October 1, 2008 valuation date, the expert concluded a stabilized average daily room rate of $140.00, and an occupancy rate of 70% for the subject property, resulting in a revenue rate, per available room, of $98.00. Additionally, as of the October 1, 2009 valuation date, the expert concluded a stabilized average daily room rate of $125.00, and an occupancy rate of 72.5% for the subject property, resulting in a revenue rate, per available room, of $90.63. Finally, as of the October 1, 2010 valuation date, the expert concluded a stabilized average daily room rate of $125.00, and occupancy rate of 75% for the subject property, resulting in a revenue rate, per available room, of $93.75.

---

[12] The court's review of the STR data disclosed certain inconsistencies. In one attachment captioned "Tab 3 – STAR Summary – My Property vs. Comp Set and Industry Segments," the "competitive set" is identified as having a 2009 occupancy rate of 61.4% and an average daily rate of $119.58. Conversely, "Tab 2" captioned Star Report for "Ridgefield Park, NJ Area Selected Properties," disclosed an annual occupancy rate of 59.1% for 2009 and an average daily rate of $119.70.

[13] The expert provided income and expense information for the "trailing 12 months" from May 2010, which apparently included June 2009 through May 2010, but did not provide the occupancy rates, average daily guest room rates, or revenue available per guest room during that period.

As of each valuation date, the expert then multiplied his derived revenue rate, per available room, by the subject property's 140 guest rooms, and then by 365 calendar days to compute estimated annual gross revenue generated from guest room sales. As of the October 1, 2008 valuation date, he computed gross revenue generated from room sales to be $5,007,800 ($98 x 140 x 365 = $5,007,800). As of the October 1, 2009 valuation date, he computed gross revenue generated from guest room sales to be $4,630,938 ($90.63 x 140 x 365 = $4,631,193).[14] As of the October 1, 2010 valuation date, he computed gross revenue generated from guest room sales to be $4,790,625 ($93.75 x 140 x 365 = $4,790,625).

To those amounts, the expert added: (i) annual estimated revenue attributable to "Food & Beverage" service; and (ii) annual estimated "Other Income," to derive an estimated total revenue. Based on his review of PKF reports, the expert determined Food & Beverage revenue of: (i) $366,162, as of the October 1, 2008 valuation date; (ii) $338,606, as of the October 1, 2009 valuation date; and (iii) $350,282, as of the October 1, 2010 valuation date. The expert further computed Other Income of: (i) $10,769, as of the October 1, 2008 valuation date; (ii) $9,959, as of the October 1, 2009 valuation date; and (iii) $10,302, as of the October 1, 2010 valuation date. Thus, the expert concluded gross revenues for the subject property as follows: (i) $5,384,731, as of the October 1, 2008 valuation date; (ii) $4,979,503, as of the October 1, 2009 valuation date; and (iii) $5,151,210, as of the October 1, 2010 valuation date.

To calculate Gross Operating Profit, the expert consulted the PKF reports to estimate the subject property's stabilized operating expenses for the 2008, 2009, and 2010 tax years. The expert estimated "Departmental Expenses" of 16% of gross room revenues and 100% of Food &

---

[14] The expert's reported gross revenue generated from guest room sales was mathematically incorrect. Based on the values reported by the expert, the gross revenue generated from room sales should have been $4,631,193 ($90.63 x 140 x 365 = $4,631,193) and not $4,630,938.

Beverage revenues. The expert further estimated expenses for "Overhead Departments," which consisted of "Administrative & General" expenses; "Sales & Marketing" expenses, including franchise fees; and "Property Operations" expenses. The expert deducted the Department Expenses and Overhead Departments expenses from the total revenue to derive Gross Operating Profit. Thus, the expert calculated the subject property's Gross Operating Profit to be as follows: (i) $2,763,444 ($5,384,731 - $1,167,410 - $1,453,877 = $2,763,444), as of the October 1, 2008 valuation date; (ii) $2,555,481 ($4,979,503 - $1,079,556 - $1,344,466 = $2,555,481), as of the October 1, 2009 valuation date; and (iii) $2,643,601 ($5,151,210 - $1,116,782 - $1,390,827 = $2,643,601), as of the October 1, 2010 valuation date.

Additionally, the expert estimated the subject property's "Fixed Expenses," comprising management fees, insurance, and "Other Fixed Expenses." The expert then deducted the "Fixed Expenses" from the Gross Operating Profit to derive Net Operating Profit. The expert calculated total "Fixed Expenses" of $258,467, as of the October 1, 2008 valuation date, $239,016, as of the October 1, 2009 valuation date, and $247,258, as of the October 1, 2010 valuation date. Thus, the expert estimated the Net Operating Income from hotel operations to be: (i) $2,504,977 ($2,763,444 - $258,467 = $2,504,977), as of the October 1, 2008 valuation date; (ii) $2,316,465 ($2,555,481 - $239,016 = $2,316,465), as of the October 1, 2009 valuation date; and (iii) $2,396,343 ($2,643,601 - $247,258 = $2,396,343), as of the October 1, 2010 valuation date.

Next, in order to compute the Net Operating Income attributable to the real estate, the expert applied expense deductions for: (i) structural reserves of 2% of estimated gross revenues; (ii) return of FF&E of 2% of estimated gross revenues; and (iii) return on FF&E of $15,000 per room. The expert then depreciated the return on FF&E to stabilize the cash flow and applied a 10% return on equity to those costs. After application of this expense deduction, the expert

14

determined the Net Operating Income attributable to the real estate to be: (i) $2,184,588, as of the October 1, 2008 valuation date; (ii) $2,012,285, as of the October 1, 2009 valuation date; and (iii) $2,085,294, as of the October 1, 2010 valuation date.

Employing both the band of investment technique and reviewing published capitalization rate information data, the expert determined a capitalization rate for the subject property for the 2009, 2010, and 2011 tax years. The expert determined a 7.21% base capitalization rate for the 2009 and 2010 tax years, and base capitalization rate of 7.08% for the 2011 tax years. After computing his base capitalization rates, the expert added or "loaded" the subject property's effective tax rate for each tax year to derive his overall capitalization rates. The expert determined an overall capitalization rate of 9.61% for the 2009 tax year, 9.72% for the 2010 tax year, and 10.34% for the 2011 tax year.

Finally, the expert applied the loaded capitalization rate to his estimated computations of Net Operating Income attributable to the real estate to reach a concluded opinion of value of: (i) $22,730,000 ($2,184,588 / .0961 = $22,732,445), as of the October 1, 2008 valuation date[15]; (ii) $20,700,000 ($2,012,285 / .0972 = $20,702,520), as of the October 1, 2009 valuation date; and (iii) $20,165,000 ($2,085,294 / .1034 = $20,7167,253), as of the October 1, 2010 valuation date.

### b. Conclusion

The court finds that the "Rushmore method," employed by the expert in this matter, is a credible and reliable approach to valuing hotels, like the subject property's hotel. This method of valuing hotels has been consistently accepted by our courts as a reasonable approach. See Glenpointe Assocs., 10 N.J. Tax 380, aff'd, 12 N.J. Tax 118; Prudential Ins. Co., 16 N.J. Tax 58,

---

[15] The expert did not compute, nor offer any calculation of what his proposed added assessment for the subject property would be for the 2009 tax year.

aff'd, 16 N.J. Tax 148; Chesapeake Hotel LP, 22 N.J. Tax 525; Ace Gaming, LLC, 23 N.J. Tax 70.

Central to the Rushmore method of hotel valuation is discerning a hotel's stabilized gross revenue, and correspondingly, stabilized net income. The estimated "stabilized net income is intended to reflect the anticipated operating results of the hotel over its remaining economic life, given any or all applicable stages of buildup, plateau, and decline in the life cycle." Prudential Ins. Co., 16 N.J. Tax at 60 (quoting Rushmore & Rubin, The Valuation of Hotels and Motels for Assessment Purposes, 274)). Accurately gauging and computing a hotel's average daily room rate and other revenue sources, and correspondingly its "stabilized net income is necessary because, in the direct capitalization method, a single net income figure is capitalized in perpetuity to determine value." Ibid. Thus, a direct causal link exists between a hotel's occupancy rate, average daily rate, and revenue rate, per available guest room, and stabilized net income.

Here, the expert did not possess the subject property's actual average daily rates, occupancy rates, and revenue rates, per available guest room, because the hotel commenced operations in or about April 2009. Therefore, in order to compute the subject property's estimated stabilized gross revenue, the expert consulted published market data procured through STR, which the court finds was reasonable in these matters. According to the expert:

> there were five hotels that we looked at, listed as a competitive set . . . So the Hilton in Hasbrouck Heights, the Holiday Inn in Hasbrouck Heights, the Marriott at Glenpointe, Hampton Inn in Ridgefield Park, and the Crowne Plaza. So what we requested is information published, based upon the operations of those hotels in order to arrive at a cash flow for the subject property. . .
> . . .
> And for the subsequent years, I did the same type of exercise. . . .

The expert further explained that the competitive hotel set was "selected based upon their location [and] condition. This is what this hotel will be competing with. So it's in the same market area,

16

and those were the hotels that were selected." The expert offered no further description, discussion, delineation of, or explanation to the court regarding the selected competitive hotel set. Thus, the court is without any detailed information about what conditions, features, amenities, qualities, access, or parking these five hotels contain. Significantly, the expert offered no explanation why the five hotels, comprising the competitive hotel set, were comparable to and competitive with the subject property's hotel. For hotels to be considered part of the competitive set, they must be "comparable to the subject in physical condition and amenities." Chesapeake Hotel LP, 22 N.J. Tax at 531. However, other than room count and year built, the expert provided no details regarding any physical features, similarities, or differences that existed between the competitive hotel set and the subject property's hotel. The court is unaware if these hotels feature luxury suites, offer concierge floors, have full-service restaurants, bars, offer in-room dining, provide banquet facilities, conference rooms, a spa, fitness centers, indoor or outdoor pools, contain indoor or outdoor parking, offer extended stay options, or offer in-room kitchenettes. Moreover, the court is unaware whether any of these hotels contain more elaborate or lavish interior finishes and features intended to cater to the tastes of more discriminating consumers. Likewise, the court has no knowledge whether the hotels in the competitive hotel set possess less features and amenities than the subject property, or have a location that is not easily accessible, and which may cater to a more budget-friendly consumer. In sum, the court is unable to conclude, based on the paucity of information in the record whether the five hotels comprising the competitive hotel set, are in fact comparable to and competitive with the subject property's hotel.

Additionally, the court's review of STR reports disclosed that the subject property is classified as an "Upscale Class" hotel property. However, apparently only one of the hotels in the comparative hotel set bears the same classification by STR. The remaining four hotels in the

17

comparative hotel set are identified as either "Upper Upscale Class" or "Upper Midscale Class." Yet, neither the expert's report, nor the expert's testimony offered any explanation of the differences between these classifications, the features, qualities, and amenities within each classification, nor any indication how these classification differences may have impacted daily average rates, occupancy rates, and correspondingly, revenue rates, per available guest room. Moreover, because the STR reports contain only the average of the daily room rates, occupancy rates, and revenue rates, per available guest room, for the comparative hotel set, it is impossible for the court to segregate the rates amongst the individual hotels and compare and contrast the data.

By definition, comparability does not require properties to be identical, as "differences between a comparable property and the subject property are anticipated. Such differences are dealt with by adjustments recognizing and explaining these differences, and then relating the two properties to each other in a meaningful way so that an estimate of the value of one can be determined from the value of the other." U.S. Life Realty Corp. v. Jackson Twp., 9 N.J. Tax 66, 72 (Tax 1987). Generally, properties are considered comparable when they "lend logical, coherent support . . . show[ing] 'comparable building density ratios, functional similarities, . . . similarity of age, construction and condition, and in some cases size.'" Ford Motor Co., 127 N.J. at 308 (quoting Shulton, Inc. v. Clifton City, 7 N.J. Tax 208, 218 (Tax 1983), aff'd, 7 N.J. Tax 220 (App. Div. 1984)). Here, however, the trial record contains little evidence that the comparative hotel set represents hotels comparative to and competitive in the marketplace with the subject property. Although the comparative hotel set may be located within the subject property's geographical region, that does not, per se, render the comparative hotel set comparable with the subject property

18

for purposes of computing average daily room rates, occupancy rates, revenue rates, per available room, and correspondingly, stabilized gross revenue.

It is well-settled that a witness who has been qualified by the court as an expert is permitted to offer opinion testimony. N.J.R.E. 702. However, the weight to be accorded expert testimony hinges "upon the facts and reasoning which form the basis of the opinion. An expert's conclusion can rise no higher than the data providing the foundation." Inmar Associates v. Edison Twp., 2 N.J. Tax 59, 66 (Tax 1980). Stated differently, "the opinion of an expert depends upon the facts and reasoning which form the basis of the opinion. Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard." Greenblatt, 26 N.J. Tax at 55. When an expert "offers an opinion without providing specific underlying reasons . . . he ceases to be an aid to the trier of fact." Jimenez v. GNOC, Corp., 286 N.J. Super. 533, 540 (App. Div. 1996), certif. denied, 145 N.J. 374 (1996)). The expert is required to "give the why and wherefore of his expert opinion, not just a mere conclusion." Ibid. When an expert's opinion lacks a reliable foundation, supported by facts and objective market data, "the court cannot extrapolate value." Inmar Associates, 2 N.J. Tax at 66.

Moreover, when the basis of an expert's conclusions are not evident, the court cannot deduce a value therefrom. Ibid. Although the facts or data relied upon by the expert need not be admissible, the testimony must nonetheless be rooted in facts, science, data or the opinions of other experts. N.J.R.E. 703. Thus, the basis of the expert's opinion must be supported by credible factual evidence or other data. Creanga v. Jardal, 185 N.J. 345, 360-62 (2005). In order for the opinion of an expert to be of any consequence, the expert must "identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable." Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992).

19

"Without explanation as to the basis, the opinion of the expert is entitled to little weight. . ." Dworman v. Tinton Falls Borough, 1 N.J. Tax 445, 458 (Tax 1980) (citing Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959), certif. denied, 30 N.J. 153 (1959)).

Here, the expert's concluded average daily room rate, occupancy rate, and revenue rate, per available guest room, as of each valuation date was based on the comparative hotel set identified in the STR report. However, without providing any factual data or evidence supporting his identification of the hotels comprising the comparative hotel set, and conclusion that these hotels were comparable to and competitive with the subject property's hotel, the expert's conclusions, as of each valuation date, with respect to the average daily rate, occupancy rate, and revenue per available guest room are entitled to little weight. Accordingly, because the revenue rate, per available guest room, is the pivotal first step under the Rushmore method and serves as the foundation of a hotel's stabilized gross revenues, the expert's final concluded value, as of each valuation date, is similarly accorded little weight by the court.

Nonetheless, the court is mindful of its obligation "to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question." Glen Wall Associates v. Wall. Twp., 99 N.J. 265, 280 (1985) (citing New Cumberland Corp. v. Roselle Borough, 3 N.J. Tax, 345, 353 (Tax 1981)). To enable the court to make an independent finding of true value, credible and competent evidence must be adduced in the trial record.

Here, the court's review of the STR report annexed to the expert's addenda discloses that, in addition to the competitive hotel set, four additional information segments were selected by the expert: "Market: Bergen-Passaic, NJ," Market Class: Upscale Class," "Tract: Bergen/E

20

Rutherford," and "Tract: Scale: Upscale Chains."[16]  The "Market: Bergen-Passaic, NJ" segment consists of 74 hotel properties, the "Market Class: Upscale Class" segment consists of 15 hotel properties, the "Tract: Bergen/E Rutherford" segment consists of 47 hotel properties, and "Tract: Scale: Upscale Chains" segment consists of 14 hotel properties.

However, no detailed information, features, amenities, or location information for each hotel is contained in the STR report.  Thus, for example, the court is unable to independently determine how many of the 15 "Market Class: Upscale Class" are of similar age and quality to the subject property and contain similar physical features, and amenities.  Moreover, the court lacks any information on the geographic location of any of these 15 hotel properties and therefore, is unable to gauge the impact that location plays, if any, in fixing its average daily room rates.

The court's independent determination of value must be based "on the evidence before it and the data that are properly at its disposal." F.M.C. Stores Co. v. Morris Plains Borough, 100 N.J. 418, 430 (1985).  Here, the court concludes that the trial record contains insufficient information to enable the court to make a credible and reliable independent finding regarding the subject property's revenue rate, per available room, and correspondingly, gross stabilized revenues as of the October 1, 2008, October 1, 2009, and October 1, 2010 valuation dates.  Accordingly, as a result of the above stated inadequacies, insufficient credible evidence exists for this court to make an independent determination of the true market value of the subject property by a fair preponderance of the evidence.

---

[16]  The expert did not include copies of the 2008 STR report in his report addenda.  However, the expert did furnish a December 2009 STR report containing year-to-date data and a "running 12 month" average, along with a percentage change.  Thus, the court would have been able to derive the approximate 2008 value by extrapolating the data from the December 2009 STR report.

## V.     <u>Conclusion</u>

The court concludes that VRP has failed to prove, by a fair preponderance of the evidence, that the subject property's 2009 tax year added assessment, and 2010 and 2011 tax years local property tax assessments fall below its true value.  Accordingly, the court shall enter judgments affirming the subject property's 2009 tax year added assessment and the 2010 and 2011 tax year local property tax assessments.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.